IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Criminal No. ELH-17-0264 |
| LATASHA JACKSON, | |
| *Defendant*. | |

**MEMORANDUM OPINION**

Latasha Jackson is serving a five-year sentence at FPC Alderson for a drug conspiracy offense, with credit dating from June 1, 2017. *See* ECF 195 (Judgment). She filed a pro se motion to "Modify" her sentence "Pursuant to 3582." ECF 411. Then, through counsel, she filed an "Emergency Motion For Compassionate Release," pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF 417. The motion is supported by a memorandum (ECF 419) (collectively, the "Motion") and several exhibits. The government opposes the Motion. ECF 429. Defendant has replied. ECF 432.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall grant the Motion. And, I shall deny ECF 411 as moot.

**I. Background**

A grand jury in the District of Maryland returned a twelve-count Superseding Indictment on May 31, 2017 (ECF 4), naming twelve defendants. It included three counts against Jackson. In particular, Jackson was charged in Count One with conspiracy to distribute and possess with intent to distribute heroin and 28 grams or more of cocaine base, in violation of 21 U.S.C. § 846. In Count Four, Jackson was charged with distribution of heroin and cocaine base, in violation of

21 U.S.C. § 841(a). Count Eight charged Jackson with distribution of heroin, in violation of 21 U.S.C. § 841(a).

On October 5, 2017, Jackson appeared before the Honorable J. Frederick Motz and entered a plea of guilty to Count One of the Superseding Indictment. ECF 148; ECF 150 (Plea Agreement).[1] As part of the Plea Agreement, Jackson stipulated to a two-level increase to her base offense level because a firearm was possessed as part of the conspiracy. ECF 150, ¶ 6(b); *see* U.S.S.G. § 2B1.1(b).

Paragraph 6(a) of the Plea Agreement contained a stipulation of facts. Jackson agreed, *inter alia*, that during the narcotics conspiracy, "law enforcement seized a firearm from one of the Defendants' co-conspirators." ECF 150 at 4, ¶ 6(a). Jackson also agreed that, in furtherance of the conspiracy, she sold crack cocaine to an undercover agent on April 28, 2017, and sold heroin to an undercover agent on May 8, 2017. *Id.*

Notably, the plea was entered pursuant to Fed. R. Crim. P. 11(c)(1)(C). ECF 150, ¶ 9. Pursuant to the terms of the C plea, the parties stipulated to a sentence of 72 months' imprisonment as the appropriate disposition of the case. *Id.*

Sentencing was held on December 7, 2017. ECF 192. By that time, the case had been reassigned to me. At the time, the defendant was 38 years of age. ECF 194 at 3.

According to the original Presentence Report (ECF 182), the defendant qualified as a career offender. *Id.* ¶¶ 22, 40. It is not clear whether the parties anticipated that finding, but it was not mentioned in the Plea Agreement. *See* ECF 150, ¶ 6(b). To the contrary, the parties anticipated a final offense level of 23. *Id.* Although the defense did not dispute the determination in its

---

[1] The case was reassigned from Judge Motz to this Court on October 13, 2017, due to the retirement of Judge Motz.

sentencing memorandum (*see* ECF 188 at 2), I disagreed. Therefore, an Amended Presentence Report was prepared (ECF 194, "PSR"). It reflected a final offense level of 23 (*id.* ¶ 25) and a criminal history category of III. *Id.* ¶ 39.

Petitioner's advisory sentencing guidelines range (the "Guidelines" or "U.S.S.G.") called for a period of incarceration of 57 to 71 months. *Id.* ¶ 94. However, based on the mandatory minimum term of 60 months, the Guidelines range was adjusted to 60 to 71 months. *Id.*; *see* U.S.S.G. § 5G1.1(c)(2).[2]

Notably, at sentencing I rejected the above-Guidelines C plea of 72 months' imprisonment. Instead, I sentenced Jackson to a term of imprisonment of 60 months. ECF 195 (Judgment). That five-year sentence corresponded with the congressionally mandated minimum term of imprisonment. *See* ECF 150 at 2, ¶ 3; *see also* 21 U.S.C. § 841(a)(1)(B). Neither Jackson nor the government noted an appeal.

Notwithstanding the Court's leniency in regard to the disposition, Jackson subsequently filed a motion under 28 U.S.C. § 2255, challenging the two-level enhancement in her Guidelines calculation for possession of a firearm by a co-conspirator, under U.S.S.G. § 2B1.1(b)(1). She relied on the Supreme Court's decision in *Sessions v. Dimaya*, 584 U.S. ___, 138 S. Ct. 1204 (2018). I rejected the claim. *See* ECF 401 (Memorandum of 4/15/19); and ECF 402 (Order of 4/15/19).

Among other things, I noted that any error in regard to the firearms offense was of no legal significance, because I imposed the congressionally mandated minimum sentence of five years of imprisonment. Thus, despite the two-level upward adjustment, Jackson suffered no prejudice,

---

[2] If defendant had been a career offender, she would have had a final offense level of 31, with a criminal history category of VI. ECF 182, ¶ 94. Her Guidelines would have been 188 to 235 months. *Id.*

even assuming, *arguendo*, that the firearm was incorrectly attributed to her. *See United States v. Pina*, 605 Fed. App'x 150, 151-52 (4th Cir. 2015).

In short, the Court had no authority to impose a sentence below the five-year mandatory minimum term of imprisonment. That minimum was calculated based solely on drug quantity, not on the basis of the gun. *See United States v. Robinson*, 404 F.3d 850, 862 (4th Cir. 2005).

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing*

*Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3)

5

the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)  **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life

>expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>(ii) The defendant is—
>
>>(I) suffering from a serious physical or medical condition,
>>
>>(II) suffering from a serious functional or cognitive impairment, or
>>
>>(III) experiencing deteriorating physical or mental health because of the aging process,
>
>that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that she is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders her eligible for a sentence reduction, the Court must then consider the factors under

8

18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III. COVID-19[3]

Defendant filed her Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[4] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

---

[3] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

That said, the Court must underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. Moreover, although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted). As of January 3, 2021, COVID-19 has infected more than 20.6 million Americans and caused over 351,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Jan. 3, 2021).

The COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393, (6th Cir. 2020). Indeed, for a significant period of time, life as we have known it came to a halt. Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness due to COVID-19. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus*

*Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.  According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes. *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

In addition, the CDC created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*  Moreover, the CDC cautions that the "more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

Unfortunately, there is currently no cure or proven treatment that is generally available. However, two vaccines (manufactured by Pfizer and Moderna) have recently become available. But, the vaccines have been available primarily to health care workers and the elderly residing in nursing homes. Distribution has been an issue, and it is anticipated that it will take several months before the vaccine is widely available to the general public.

To stem the spread of the virus, health care professionals and scientists have urged the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces

within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954

13

F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, however, the virus persists in penal institutions.[5]  As of January 3, 2021, the BOP had 123,530 federal inmates and 36,000 staff.  And, as of the same date, the BOP reported that 7,220 inmates and 1,714 BOP staff currently tested positive for COVID-19; 32,192 inmates and 2,880 staff have recovered from the virus; and 179 inmates and two staff members have died from the virus.  Moreover, the BOP has completed 95,830 COVID-19 tests. *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 3, 2021).  *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

With respect to FPC Alderson, where the defendant is a prisoner, as of January 6, 2021, the BOP reported that 1 inmate and 1 staff have tested positive for COVID-19 and 10 inmates and 45 staff have recovered at the facility. And, the facility has completed 357 tests.  There have been no reported deaths.  *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 6, 2021).

The BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021),

---

[5] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. The BOP's administration of the vaccine will "align" with recommendations of the CDC. *Id.* at 4. Accordingly, once the BOP receives the vaccine, a prisoner at heightened risk will receive priority for receipt of the vaccine. *Id.* at 6.

It appears that the BOP received its first shipment of vaccines on or about December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. But, the BOP plans to administer its initial allotment of the vaccine to BOP staff members. *Id.* The Court has not been informed by the government as to when the BOP will begin to inoculate its prisoners.

### IV. Discussion

Jackson, who is now 42 years of age (*see* ECF 194 at 2), has moved for compassionate release on the ground that her health conditions, systemic lupus erythematosus and severe obesity (BMI over 40), render her particularly vulnerable to COVID-19. *See* ECF 419.[6] In particular, defendant avers that she suffers from a "suppressed immune system caused by the medication regime used to treat her systemic lupus erythematosus." *Id.* at 4; *see also id.* at 5. In addition, she claims to have gained over 100 pounds since she was sentenced in 2017, due partly to her medications. *Id.* at 5.

The government concedes that Jackson's "morbid obesity" qualifies as an extraordinary and compelling reason that renders her eligible for release. ECF 429 at 4. Nevertheless, it opposes

---

[6] A request for compassionate release was first submitted to the Warden on April 19, 2020. ECF 48-1. The request was promptly denied. *Id.*; *see* ECF 419 at 3. Exhaustion is not contested.

Jackson's release.

Numerous courts have found that, in light of the COVID-19 pandemic, a serious chronic medical condition qualifies as a compelling reason for compassionate release. *See, e.g.*, *United States v. Salvagno,* No. 5:02-cr-00051-LEK, 2020 WL 3410601 (N.D.N.Y June 22, 2020) (granting compassionate release to inmate whose sole medical condition is hypertension); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals with hypertension[.]"); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection).

To be sure, the coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). But, in view of defendant's obesity and her serious medical condition, I am readily satisfied that she satisfies the "extraordinary and compelling" prong of the § 3582 analysis.

The Court must also consider whether, if released, Jackson would pose a danger to the community. *See* 18 U.S.C. §§ 3142(g); 3582(c)(1)(A)(ii). The government urges that conclusion. Among other things, it points out that the defendant is "a recidivist offender." ECF 429 at 6.

In my view, defendant would not pose a danger if released, and the sentencing factors under 18 U.S.C. § 3553(a) weigh in favor of defendant's release. The § 3553(a) factors include: (1) the

nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

To be sure, the crime here was serious. The defendant engaged in the sale of cocaine and heroin in April and May of 2017 to undercover informants. ECF 194, ¶¶ 7-11. And, a firearm was seized from a codefendant. But, defendant did not have a managerial or leadership role. She engaged in street-level sales and was not personally in possession of the firearm.

The defendant was convicted of several prior offenses. In 2003, she was convicted of a felony drug offense. She received a three-year sentence, but almost all of it was suspended. ECF 914, ¶ 28. She then violated her probation three times. *Id.* Defendant was convicted of a theft offense in 2005, for which she was sentenced to time served, *i.e.*, 51 days. *Id.* ¶ 29. Then, in 2006, she was convicted of second degree assault, for which she received a six-month sentence, of which five months were suspended. *Id.* ¶ 30. In 2008, Jackson was convicted of a felony drug offense. *Id.* ¶ 31. She received a sentence of 12 years, but virtually all of it was suspended. *Id.* ¶ 31. Thereafter, she violated her probation. *Id.* The defendant was again convicted of theft in 2013, and again received a sentence that was almost entirely suspended, and again violated probation. *Id.* ¶ 32. Other relatively minor convictions are reflected in ¶¶ 33-37 of the PSR, with the largest sentence being 40 days. *Id.* ¶ 35.

A review of defendant's prior record establishes that, until the instant offense, her sentences were very lenient. She has now served a sentence far longer than any prior sentence. And, there is no indication that the defendant ever used violence. Further, as noted, it appears that the

defendant was a "low-level participant" in the conspiracy at issue here. ECF 419 at 13.

In addition, as the defense argues, Ms. Jackson's personal history merits consideration. In advance of sentencing, the defense submitted a compelling memorandum outlining various aspects of defendant's challenging life. *See* ECF 188.

The defendant was born into poverty and raised by her mother. *Id.* Her father, who died in 2015, was largely absent from her life. It was the defendant's own mother who introduced her to the drug trade. *Id.* The defendant has struggled with drug addiction since she began drug use in her teens. ECF 188 at 4; ECF 194, ¶¶ 76-81.

Sadly, the defendant witnessed the death of her half-brother to gun violence in 2005. ECF 188 at 5. Another brother was shot to death when he was just 14 years old. *Id.* And, the defendant was shot in the leg. ECF 194, ¶ 68; ECF 188 at 5.[7]

The defendant is the mother of seven children. ECF 188 at 4. She was only 15 at the time of her first pregnancy and dropped out of high school at that time. *Id.* At sentencing, the children ranged in age from 1 to 25, born of multiple relationships. *See* ECF 914, ¶¶ 57-62. Several of the fathers were incarcerated and none had provided support. *Id.*

In addition, the defendant has a documented history of serious depression, for which she was taking medication at the time of sentencing. ECF 194, ¶¶ 71-75. And, in 2010 she was diagnosed with Lupus. *Id.* ¶ 68.

Perhaps most significant, the defendant has already served about 80% of her five-year sentence. She has a projected release date of September 3, 2021. ECF 419 at 3.

In my view, compassionate release is warranted. I will reduce the defendant's sentence to

---

[7] The defense sentencing memorandum indicates that the defendant was shot in 2005. ECF 188 at 5. The PSR states that the defendant was shot in 2002. ECF 194, ¶ 68. The discrepancy is not material.

time served plus ten days. I will adopt the same terms and conditions of supervised release previously imposed, with the added condition that the defendant shall be subject to a period of home confinement for seven months as a condition of supervised release.

## V. Conclusion

For the forgoing reasons, I shall grant the Motion (ECF 417).

An Order follows, consistent with this Memorandum Opinion.

Date: January 7, 2021                                     /s/
                                                  Ellen Lipton Hollander
                                                  United States District Judge